Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | |
| Plaintiff, | |
| vs. | CV- 21- |
| LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants. | |

# I. INTRODUCTION

1.   This is a civil action for judicial review under the Endangered Species Act of the U.S. Forest Service's (Forest Service) and/or U.S. Fish and Wildlife Service's (FWS) failure to reinitiate ESA consultation on the Helena-Lewis & Clark National Forest Plan, failure to reinitiate ESA consultation on the Blackfoot Travel Plan, failure to reinitiate ESA consultation on the Divide Travel Plan, failure to initiate or reinitiate ESA consultation on the Elkhorns Travel Plan, failure to initiate or reinitiate ESA consultation on the North Belts Travel Plan, failure to initiate or reinitiate ESA consultation on the South Belts Travel Plan, and failure to reinitiate ESA consultation on the Rocky Mountain Ranger District Travel Plans.

2.   Defendants' actions or omissions violate the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq* and are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.   Plaintiff Alliance for the Wild Rockies requests that the Court order the agencies to prepare lawful ESA consultations for plans denoted above.

4.   Plaintiff seeks a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and such other relief as this Court deems just and proper.

## II.  JURISDICTION

5.     This action arises under the laws of the United States and involves the

United States as a Defendant. Therefore, this Court has subject matter

jurisdiction over the claims specified in this Complaint pursuant to 28

U.S.C. §§ 1331, 1346.

6.     An actual controversy exists between Plaintiff and Defendants.  Plaintiff's

members use and enjoy the Helena-Lewis and Clark National Forest for

hiking, fishing, hunting, camping, photographing scenery and wildlife, and

engaging in other vocational, scientific, spiritual, and recreational activities.

Plaintiff's members intend to continue to use and enjoy the area frequently

and on an ongoing basis in the future.

7.     The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiff's members have been and will be adversely affected and

irreparably injured if Defendants continue to violate the ESA by ignoring

and refusing to meaningfully address the impacts of chronic, recurring

illegal motorized use on grizzly bears.  These are actual, concrete injuries

caused by Defendants' failure to comply with mandatory duties under ESA.

The requested relief would redress these injuries and this Court has the

authority to grant Plaintiff's requested relief under 28 U.S.C. §§ 2201 &

2202, and 5 U.S.C. §§ 705 & 706.

8.     Plaintiff submitted a 60 Day Notice of Intent to Sue under the ESA to

Defendants over 60 days prior to filing this complaint.  Thus, this Court has

jurisdiction over Plaintiff's claims.

### III. VENUE

9.     Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1).

Defendant Marten resides within the Missoula Division of the United States

District Court for the District of Montana.

### IV. PARTIES

10.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-

profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems.  Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members, many of whom are located in

Montana.  Members of the Alliance observe, enjoy, and appreciate

Montana's native wildlife, water quality, and terrestrial habitat quality, and

expect to continue to do so in the future, including in the Helena-Lewis and

Clark National Forest.  Alliance's members' professional and recreational

activities are directly affected by Defendants' failure to perform their lawful

duty to protect and conserve these ecosystems as set forth below.  Alliance

for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

11.   Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Helena-Lewis and Clark National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

12.   Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Helena-Lewis and Clark National Forest.

13.   Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is an administrative agency within the U.S. Department of Interior, and is responsible for the lawful management of species listed under the Endangered Species Act.

## V.  FACTUAL ALLEGATIONS

A.   GRIZZLY BEARS & ROADS

14.   In terms of all of the human uses that affect grizzly bears, FWS has long found: "[r]oads probably pose the most imminent threat to grizzly habitat

today []. The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears."

15.    Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and intentional poachings.

16.    Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers.

17.    Roads and human access also result in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions.

18.    Displacement may have long term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads."

19.    Grizzly bears are displaced from open and closed roads: "grizzlies avoided roaded areas even where existing roads were officially closed to public use []. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack

of use of areas near roads by female grizzly bears in this area. This research demonstrated that a significant portion of the habitat in the study area apparently remained unused by female grizzlies for several years. Since adult females are the most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population."

20. Displacement may negatively impact the survival rates of grizzly cubs: "survivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [Northern Continental Divide Ecosystem]. The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads."

21. The Recovery Plan finds that "[t]imber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/ grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into

formerly unroaded areas may cause bears to abandon the area."

22.    In light of these harms, current peer-reviewed science still finds that roads
       pose significant threats to grizzly bear survival: "[o]f all the covariates we
       examined, the amount of secure habitat and the density of roads in
       nonsecure habitat on public lands had the greatest effect on grizzly bear
       survival."

B.    ILLEGAL MOTORIZED USE ON THE FOREST

23.    In 2019, Plaintiff requested information from the Forest Service law
       enforcement division regarding known violations of road restrictions on the
       Helena - Lewis & Clark National Forest (Forest) over the prior five-year
       period.

24.    In particular, Plaintiff is concerned about violations of road restrictions in
       habitat where threatened grizzly bears may be present.

25.    According to the U.S. Fish & Wildlife Service, the following mountain
       ranges within the Helena-Lewis & Clark National Forest are areas where
       grizzly bears may be present: Rocky Mountain Range, Upper Blackfoot,
       Divide, Elkhorns, and Big Belts.

26.    The Rocky Mountain Range and a portion of the Upper Blackfoot is
       considered "Primary Conservation Area" for grizzly bears.

27.    The remaining portion of the Upper Blackfoot is considered "Management

7

Zone 1" for grizzly bears.

28.   The Divide, Elkhorns, and Big Belts are all considered "Management Zone

2" for grizzly bears.

29.   The map below illustrates these zones:



30.   In the areas on the Forest where grizzly bears may be present, the Forest

Service's law enforcement division records demonstrate that, within the

five-year period from mid-2014 to mid-2019, there were hundreds of

reported violations of road restrictions, including but not limited to the

following:

> • 142 reported violations of road restrictions in the Big Belts,
>
> • 60 reported violations of road restrictions in the Divide,
>
> • 52 reported violations of road restrictions in the Elkhorns, and
>
> • 25 reported violations of road restrictions in the Rocky Mountain Range.

31.    In addition, it is unknown how many other violations occurred that were either not witnessed, or witnessed but not reported to law enforcement.

32.    Recurring violations demonstrate that illegal motorized use is a chronic problem on the Forest in areas where grizzly bears may be present.

33.    Although the law enforcement division of the Forest Service possesses records of recurring illegal motorized use, these records are generated as a part of law enforcement observations or reports to law enforcement, and there is no record of regular transmission of these records or data from the law enforcement division to the management divisions of the Forest Service.

34.    Additionally, there is no record of Forest Service management divisions regularly requesting records of illegal motorized use from the law enforcement division.

35.    Accordingly,  Forest Service management divisions do not have any regular

reports that disclose the details of law enforcement reports of illegal

motorized use on the Forest, quantify the number of miles of additional

motorized use that these hundreds of violations represent, or analyze how

the illegal motorized use affects or may affect grizzly bears.

36.   Because the Forest Service has not quantified recurring illegal motorized

use, road density calculations created by the Forest Service management

divisions in management analysis and decision documents do not include

recurring illegal motorized use in either "open" or "total" road calculations;

the calculations also do not  exclude these areas from secure habitat

calculations.

37.   By excluding known and recurring illegal motorized use from road density

calculations as a matter of course, the Forest Service is significantly

underestimating both the amount of motorized use on the Forest, and the

actual effects of motorized use on the Forest on grizzly bears.

C.  FOREST PLAN CONSULTATION – 2014

38.   The 2014 Biological Opinion/Incidental Take Statement for the Forest Plan

limits new permanent roads to 5 miles and new temporary roads to 30 miles,

but it assumes that "temporary roads would be effectively closed upon

project completion." It also assumes that the Forest is closed "to off-route

wheeled motorized travel . . . ."

39.   Both assumptions have proven false.

40.   In its response to Plaintiff's 60-day notice of intent to sue, the Forest Service concedes: "On occasion, there has been trespass around gates onto temporary roads generally after hours when workers are not on site (pers comm sale administrators)."

41.   In its response to Plaintiff's 60-day notice of intent to sue, the Forest Service states: "it is not practical or possible to install fence along the entire motorized route system on the Forest in order to prevent off route driving."

42.   The recurring illegal motorized use off-route and/or on temporary roads that are not effectively closed likely amounts to a number of de facto roads that exceed both of these mileage caps.

43.   The Incidental Take Statement states that "[i]f increases in permanent road construction exceed 5 miles over the next 10 years, then the level of incidental take we anticipated in our first surrogate measure of take would be exceeded and therefore the level of take exempted would be exceeded."

44.   The Incidental Take Statement further states: "If more than 30 miles of temporary motorized routes are constructed over the next 10 years, then the level of incidental take we anticipated in our second surrogate measure of take would be exceeded and the level of take exempted would be exceeded."

45.    The Incidental Take Statement states: "Under CFR 402.16 (1), in either of these scenarios, reinitiation of consultation would be required."

46.    There is only one mechanism set forth in the Incidental Take Statement to monitor compliance with these conditions: "The Forest shall maintain an up-to-date record of location and length of new permanent and temporary roads constructed and roads decommissioned on the Divide Landscape. The status of these roads (i.e. open or restricted) and presence of signage, barrier or closure device, if applicable, shall also be described.  The Forest shall complete a report with this information and submit it to the Service's Montana Field Office by June 1 of each year for the preceding calendar year."

47.    On December 27, 2019, Plaintiff sent a FOIA request to the Forest Service for "[a]nnual monitoring reports required by the 2014 Forest Plan Biological Opinion on grizzly bears (2014- present)[]."

48.    The FOIA response from the Forest Service did not contain the required monitoring reports.

49.    In response to Plaintiff's subsequent  ESA 60-day notice, the Forest Service stated on May 22, 2020 that it was "preparing a monitoring report consolidating all of the reporting requirements from 2014 through 2019."

50.    In other words, prior to the 60-day notice of intent to sue, the Forest Service

had made no effort to comply with its binding monitoring report
requirement.

51.     The Forest Service provided no explanation for its refusal to comply with
        the binding annual monitoring report requirement prior to the threat of
        litigation.

52.     In its response to Plaintiff's 60-day notice of intent to sue, the Forest
        Service concedes that there is "recurring illegal road use" in at least "a few
        locations."

53.     In its response to Plaintiff's 60-day notice of intent to sue, the Forest
        Service failed to provide any documentation in which the agency has
        analyzed the effects on grizzly bears from recurring illegal motorized use.

54.     In its response to Plaintiff's 60-day notice of intent to sue, the Forest
        Service argued: "Illegal road use is not an authorized agency action
        therefore consultation will not be re-initiated relative to the continued
        implementation of the HNF Forest Plan. However, the effects of this use are
        being considered as part of the environmental baseline through the Forest
        Plan revision consultation process."

D.  BLACKFOOT TRAVEL PLAN CONSULTATION

55.     The Incidental Take Statement for the Blackfoot Travel Plan states: "we
        anticipate incidental take within the Red Mountain and Arrastra Mountain

subunits within the recovery zone and areas of high road density outside of the recovery zone. We use the existing levels of access management and the levels that will result from implementation of the Travel Plan as our surrogate measures of incidental take. These include OMRD, TMRD, and core within the Red Mountain subunit, TMRD within the Arrastra Mountain subunit, and open motorized linear route densities and mileage outside of the recovery zone."

56.  The Incidental Take Statement for the Blackfoot Travel Plan includes two tables that set forth these road densities (Table 4 and Table 5):

Table 4. Surrogate measures of incidental take related to OMRD, TMRD, and core within the Red Mountain and Arrastra Mountain subunits within the recovery zone.

| Subunit | | OMRD | TMRD | Core |
|---|---|---|---|---|
| Red Mountain | Existing condition | 26% | 25% | 56% |
| | Post implementation | 21% | 21% | 63% |
| Arrastra Mountain | Existing condition | 19% | 21% | 72% |
| | Post implementation* | 16% | 17% | 75% |

*upon implementation of the Travel Plan, we do not anticipate incidental take within the Arrastra Mountain subunit.

Table 5. Surrogate measure of incidental take related to the action area outside of the recovery zone.

| Outside the Recovery Zone | Miles of Open Route | Linear Open Route Density |
|---|---|---|
| Existing Condition | 427 | 1.6 |
| Post Implementation | 293 | 1.1 |

57.   The Incidental Take Statement for the Blackfoot Travel Plan states: "once access conditions are improved by projects, those conditions must be maintained or improved, or the amount of take we anticipate over time would be exceeded."

58.   The Incidental Take Statement for the Blackfoot Travel Plan mandates: "if permanent changes depart in a negative manner from conditions we describe above in the surrogate measures, over the life of the Travel Plan, then the level of incidental take we anticipated in our surrogate measures of take would be exceeded and therefore the level of take exempted would be exceeded."

59.   The Incidental Take Statement for the Blackfoot Travel Plan mandates: "Under C.F.R. § 402.16 (1), in any one of these scenarios, reinitiation of consultation would be required."

60.   The Incidental Take Statement for the Blackfoot Travel Plan requires the following non-discretionary measures: "[t]he Forest shall assure that restricted roads are effectively restricted and are not being used by wheeled motorized vehicles upon route closure" and "[t]he Forest shall assure that closed routes used for administrative purposes are gated to the public and use is limited to Forest personnel, permittees, or contractors."

61.   There is one mechanism to monitor compliance: "the Forest shall complete a

report with the information listed below and submit it to the Service's Montana Field Office by March 1 of each year for the preceding calendar year. The report shall include: a. Location and length of routes constructed, restricted, and decommissioned within the action area; b. The status of these routes (i.e. open or restricted) and presence of signage, barrier or closure device, if applicable, shall also be described; c. OMRD, TMRD, and core for the Red Mountain and Arrastra Mountain subunits in the recovery zone; and d. Miles of open routes and linear open route density for the action area outside of the recovery zone."

62. On December 27, 2019, Plaintiff sent a FOIA request to the Forest Service for "[a]nnual monitoring reports required by the 2016 Blackfoot Travel Plan Biological Opinion on grizzly bears (2016 to present)[]."

63. The FOIA response from the Forest Service did not contain the required monitoring reports.

64. In response to Plaintiff's subsequent  ESA 60-day notice, the Forest Service stated on May 22, 2020 that it was "preparing a monitoring report consolidating all of the reporting requirements from 2016 through 2019."

65. In other words, prior to the 60-day notice of intent to sue, the Forest Service had made no effort to comply with its binding monitoring report requirement.

66.    The Forest Service provided no explanation for its refusal to comply with the binding annual monitoring report requirement prior to the threat of litigation.

67.    Plaintiff subsequently sent a FOIA request to the Forest Service for the promised "consolidated" monitoring report.

68.    The  report discloses that 38 miles of roads that must be restricted, i.e. "closed," currently have no closure device in place.  The location of these de facto open roads is not disclosed, and not possible to discern from the report.

69.    The report also discloses that 118 miles of roads that must be decommissioned have not yet been decommissioned.  The location of these 118 miles of open roads is not disclosed and is not discernible from the report.  However, the map in the report does show that no roads have been decommissioned in the Arrastra Mountain grizzly bear subunit.

70.    Moreover, regarding roads that were decommissioned, the mechanism used, i.e. what type of barrier  – if any – was put into place to permanently prevent all motorized use, is not disclosed in the report.

71.    Regarding OMRD, TMRD, and core for the Red Mountain and Arrastra Mountain subunits, the only information provided in the report appears to compare three different methods of measurements, as opposed to one

method of measurement taken each year.  Table 4 compares (1) the 2016 Incidental Take Statement measurement to (2) an "adjusted" type of measurement, presumably from 2016 although it is unspecified, to (3) a measurement taken for a completely different purpose – a monitoring requirement for the NCDE forest plan amendment.  In other words, the report compares apples to oranges to bananas instead of providing data for apples in 2016, 2017, 2018, and 2019 as required by the Incidental Take Statement in order to determine whether there was an unlawful increase in roads.

72.   In particular, the report's representations regarding the Arrastra subunit are troubling.  The report represents that total motorized route density was 21% in the "2016 Biological Opinion," and then 17% in the "adjusted" calculation, and then 18% in the "Draft 2019 Report."  However, as noted above, zero roads have been decommissioned in the Arrastra subunit so the total motorized route density percentage has not changed from the 21% figure set forth as the existing condition in the Blackfoot Travel Plan Incidental Take Statement.

73.   Regarding miles of open routes and linear open route density for the action area outside of the recovery zone, the report simply ignores this requirement altogether, and without explanation, provides no information.

74.   Finally, in response to Plaintiff's notification that the Forest Service is

violating the requirement that it  "shall assure that restricted roads are

effectively restricted and are not being used by wheeled motorized vehicles

upon route closure" and "shall assure that closed routes used for

administrative purposes are gated to the public and use is limited to Forest

personnel, permittees, or contractors," in the 60-day notice response, the

Forest Service acknowledges the data presented by Plaintiff from the law

enforcement division, and categorizes it as follows:

> Some of these violations involve damage to gates or locks;
> most involve skirting closures or simply driving off road. When
> gates are breached through cut locks or gate destruction, the
> Forest remedies the situation through repair or replacement as
> soon as possible after being made aware of the violation.
> Skirting gates often occurs in open country where little to no
> obstructions exist on either side of the gated road. In these
> situations, the Forest has built fence or placed boulders
> alongside the gate to discourage this type of use. It's not
> practical or possible to install fence along the entire motorized
> route system on the Forest in order to prevent off route driving.
> . . .
> The violation data presented in Appendix A does not
> indicate recurring illegal road use except in a few locations.

75.   In its response to Plaintiff's 60-day notice of intent to sue, the Forest

Service failed to provide any documentation in which the agency has

analyzed the effects on grizzly bears from admitted "recurring illegal road

use."

76. In its response to Plaintiff's 60-day notice of intent to sue, the Forest Service argued: "illegal road use is not an authorized agency action therefore consultation will not be re-initiated for the Blackfoot Non-Winter Travel Plan. However, the effects of this use on grizzly bears are being considered as part of the environmental baseline through the Forest Plan revision consultation process."

E. DIVIDE TRAVEL PLAN CONSULTATION

77. The Biological Opinion/Incidental Take Statement for the Divide Travel Plan requires: "if over the life of the Divide Travel Plan permanent increases in linear open route density depart from conditions we describe here and in Table 6, then the level of incidental take we anticipate in our surrogate measures of incidental take would be exceeded and therefore the level of take exempted would be exceeded. Under CFR 402.16 (1), in this scenario, reinitiation of consultation would be required."

78. Table 6 of the Incidental Take Statement is set forth below:

| Table 6. Surrogate Measure of Incidental Take Related to Linear Open Route Density by Elk Herd Units within the Actin Area | | |
|---|---|---|
| Elk Herd Unit | Existing Linear Open Route Density* for area within Forest Boundary | Proposed Linear Open Route Density* for area within Forest Boundary |
| Little Prickly Pear – Ophir Creek | 2.25 | 1.72 |
| Greenhorn Mountain | 2.32 | 1.06 |
| Spotted Dog-Little Blackfoot | 1.37 | 1.14 |
| Jericho Mountain | 1.91 | 1.67 |
| Black Mountain -Brooklyn Bridge | 1.03 | 1.02 |
| Quartz Creek | 1.13 | 1.04 |
| *Linear open route density is displayed as miles per square mile | | |

79.    The Incidental Take Statement requires the following non-discretionary

measures:  "The Forest shall assure that restricted roads are effectively

restricted and are not being used by wheeled motorized vehicles upon route

closure" and "The Forest shall assure that closed routes used for

administrative purposes are gated to the public and use is limited to Forest

personnel, permittees, or contractors."

80.    There is one mechanism provided to ensure compliance with the Incidental

Take Statement: "the Forest shall complete a report with the information

listed below and submit it to the Service's Montana Field Office by June 1

of each year for the preceding calendar year. The report shall include: a.

Location and length of routes constructed, restricted, and decommissioned

within the action area; b. The status of these routes (i.e. open or restricted)

and presence of signage, barrier or closure device, if applicable, shall also

be described; c. Linear open route density by elk herd unit for the area

within the Forest boundary."

81.    In light of this binding requirement, on December 27, 2019, Alliance filed a

FOIA request for "[a]nnual monitoring reports required by the 2016 Divide

Travel Plan Biological Opinion on grizzly bears (2016 to present)[]."

82.    The FOIA response from the Forest Service did not contain the required

monitoring report.

83.   In response to Plaintiff's subsequent ESA 60-day notice, the Forest Service stated on May 22, 2020 that it was "preparing a monitoring report consolidating all of the reporting requirements from 2016 through 2019."

84.   In other words, prior to the 60-day notice of intent to sue, the Forest Service had made no effort to comply with its binding monitoring report requirement.

85.    The Forest Service provided no explanation for its refusal to comply with the binding annual monitoring report requirement prior to the threat of litigation.

86.   Plaintiff subsequently sent a FOIA request to the Forest Service for the promised "consolidated" monitoring report.

87.   The report discloses that 76 miles of roads that must be restricted, i.e. "closed," currently have no closure device in place: "there are still approximately 76 miles of closed roads (yearlong or seasonal) for which an effective closure has yet to be installed."  However, the location of these de facto open roads is not disclosed.

88.   Additionally, the report represents that only 35.5 miles of road have been decommissioned since implementation of the Divide Travel Plan, although NEPA decisions require decommissioning of 168.7 miles of roads.

89.   Moreover, regarding decommissioned roads, the mechanism used, i.e. what

type of barrier  – if any – was put into place to permanently prevent all

motorized use, is not disclosed in the report.

90.   The report also indicates that none of the affected Elk Herd Units (Little

Prickly Pear – Ophir Creek, Greenhorn Mountain, Spotted Dog – Little

Blackfoot, Jericho Mountain, Black Mountain – Brooklyn Bridge, or Quartz

Creek) yet comply with the linear open road density set by the Divide

Travel Plan.

91.   Finally, in response to Plaintiff's notification that the Forest Service is

violating the requirement that it  "shall assure that restricted roads are

effectively restricted and are not being used by wheeled motorized vehicles

upon route closure" and "shall assure that closed routes used for

administrative purposes are gated to the public and use is limited to Forest

personnel, permittees, or contractors," in the 60-day notice response, the

Forest Service acknowledges the data presented by Plaintiff from the law

enforcement division, and categorizes it as follows:

> Some of these violations involve damage to gates or locks;
> most involve skirting closures or simply driving off road. When
> gates are breached through cut locks or gate destruction, the
> Forest remedies the situation through repair or replacement as
> soon as possible after being made aware of the violation.
> Skirting gates often occurs in open country where little to no
> obstructions exist on either side of the gated road. In these
> situations, the Forest has built fence or placed boulders
> alongside the gate to discourage this type of use. It's not
> practical or possible to install fence along the entire motorized

route system on the Forest in order to prevent off route driving.
. . .
The violation data presented in Appendix A does not indicate recurring illegal road use except in a few locations.

92.    Contrary to this boilerplate argument that illegal use is only recurring in a "few locations," the maps tell a dramatically different story of excessive illegal motorized use in the Divide area.  Below, the map on the left shows the locations of barriers and gates; the map on the right shows the location of reported road violations:



93.     In its response to Plaintiff's 60-day notice of intent to sue, the Forest

        Service failed to provide any documentation in which the agency has

        analyzed the effects on grizzly bears from admitted "recurring illegal road

        use."

94.     In its response to Plaintiff's 60-day notice of intent to sue, the Forest

        Service argued: "illegal road use is not an authorized agency action

        therefore consultation will not be re-initiated for the Divide Travel Plan.

        However, the effects of this use on grizzly bears are being considered as

        part of the environmental baseline through the Forest Plan revision

        consultation process."

F.      ELKHORNS TRAVEL PLAN

95.     The Forest Service prepared a Travel Plan in 1995 for the Elkhorns.

96.     In light of the official government determination that the Elkhorns are

        "Management Zone 2" for grizzly bears, it is undisputed that grizzly bears

        "may be present" in the Elkhorns.

97.     Recurring illegal motorized use is a problem in the Elkhorns.  The map

        below shows reported road violations over five years:

//


//



98.   On December 27, 2019, Plaintiff filed a FOIA request for the "Biological
Assessment for Elkhorns Travel Plan" and the "Biological Opinion for
Elkhorns Travel Plan."

99.   In response, the Forest Service did not provide either document because the
documents do not exist.

100.   In response to Plaintiff's 60-day notice of intent to sue, on May 22, 2020,
the Forest Service stated: "The Forest is initiating consultation for the

Elkhorns Travel Plan . . . to address effects to grizzly bears. . . . Illegal road use is not an authorized agency action.  However, the effects of this use are being considered as part of the environmental baseline for initiation/reinitiation of these travel plans as well as being considered as part of the environmental baseline through the Forest Plan revision consultation process."

101.   On December 18, 2020, Plaintiff filed a FOIA request for the Elkhorns Travel Plan consultation promised by the Forest Service.

102.   On January 6, 2021, the Forest Service informed Plaintiff that there were no responsive records for the FOIA request because the Forest Service has not submitted a biological assessment to FWS to initiate ESA consultation for the Elkhorns Travel Plan.

103.   In other words, over nine months after Plaintiff sent the 60-day notice, the agencies have still not initiated ESA consultation on the Elkhorns Travel Plan.

G.  NORTH BELTS TRAVEL PLAN

104.   The Forest Service prepared a Travel Plan for the North Belts in 2005.

105.   The agencies prepared an ESA consultation for this Travel Plan for lynx, gray wolf, and bald eagle. Grizzly bears were not included.

106.   In light of the official government determination that the Big Belts are

"Management Zone 2" for grizzly bears, it is undisputed that grizzly bears "may be present" in the Big Belts.

107. Recurring illegal motorized use is a problem in the North Belts. The map below shows reported road violations over five years:



108. In response to Plaintiff's 60-day notice of intent to sue, on May 22, 2020, the Forest Service stated: "The Forest is re-initiating consultation for the

North Belts Travel Plan to address effects to grizzly bears (North Belts was

consulted upon for effects to lynx).  Illegal road use is not an authorized

agency action.  However, the effects of this use are being considered as part

of the environmental baseline for initiation/reinitiation of these travel plans

as well as being considered as part of the environmental baseline through

the Forest Plan revision consultation process."

109.   On December 18, 2020, Plaintiff filed a FOIA request for the North Belts

Travel Plan consultation promised by the Forest Service.

110.   On January 6, 2021, the Forest Service informed Plaintiff that there were no

responsive records for the FOIA request because the Forest Service has not

submitted a biological assessment to FWS to initiate ESA consultation.

111.   In other words, over nine months after Plaintiff sent the 60-day notice, the

agencies have still not reinitiated ESA consultation on the North Belts

Travel Plan.

H.  SOUTH BELTS TRAVEL PLAN

112.   The Forest Service prepared a Travel Plan in 1999 for the South Belts.

113.   In light of the official government determination that the Big Belts are

"Management Zone 2" for grizzly bears, it is undisputed that grizzly bears

"may be present" in the Big Belts.

114.   On December 27, 2019, Plaintiff filed a FOIA request for the "Biological

Assessment for South Belts Travel Plan" and the "Biological Opinion for South Belts Travel Plan."

115. In response, the Forest Service did not provide either document because the documents do not exist.

116. In response to Plaintiff's 60-day notice of intent to sue, on May 22, 2020, the Forest Service stated: "The Forest is initiating consultation for . . . the South Belts Travel Plan to address effects to grizzly bears. . . . Illegal road use is not an authorized agency action.  However, the effects of this use are being considered as part of the environmental baseline for initiation/reinitiation of these travel plans as well as being considered as part of the environmental baseline through the Forest Plan revision consultation process."

117. On December 18, 2020, Plaintiff filed a FOIA request for the South Belts Travel Plan consultation promised by the Forest Service.

118. On January 6, 2021, the Forest Service informed Plaintiff that there were no responsive records for the FOIA request because the Forest Service has not submitted a biological assessment to FWS to initiate ESA consultation for the South Belts Travel Plan.

119. In other words, over nine months after Plaintiff sent the 60-day notice, the agencies have still not initiated ESA consultation on the South Belts Travel

Plan.

## I. ROCKY MOUNTAIN RD TRAVEL PLAN

120.  The Forest Service prepared a Travel Plan for the Rocky Mountain Ranger
      District in 2007.

121.  The agencies prepared an ESA consultation for grizzly bear, lynx, gray
      wolf, and bald eagle.

122.  The consultation reached a conclusion of "not likely to adversely affect"
      grizzly bears. The conclusion is based in part on an assumption that
      "[w]idespread public education efforts regarding new travel management
      regulations, coupled with enhanced enforcement of new regulations would
      help make the transition occur more quickly and smoothly. Effective
      signing, patrolling, and enforcement as ongoing activities would help avoid
      adverse effects."

123.  The "new regulations" were the "2005 FS OHV regulations [that] prohibit
      off-trail motorized travel."

124.  In response to Plaintiff's 60-day notice of intent to sue, the Forest Service
      acknowledged 17 records of "illegal vehicle use on closed roads" between
      mid-2014 and mid-2019 in this area.

125.  Additionally, the Forest Service acknowledged but did not quantify
      additional instances of "motor vehicle use off road" and "vehicle tracks off

designated routes" between mid-2014 and mid-2019 in this area.

126.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service stated: "Illegal road use is not an authorized agency action therefore consultation will not be re-initiated for the Rocky Mountain Front Travel Plans (Badger-Two Medicine and Birch Creek South). However, the effects of this use on grizzly bears are being considered as part of the environmental baseline through the Forest Plan revision consultation process."

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*The Forest Service or FWS must reinitiate ESA consultation on the Forest Plan.*

127.   All previous paragraphs are incorporated by reference.

128.   The Forest Service or FWS  must reinitiate ESA consultation on the Forest Plan to address the following: (a) its violation of the annual monitoring report requirement, which is a violation of a non-discretionary requirement of the Incidental Take Statement, (b) its failure to ensure that temporary roads are effectively closed and that the Forest is effectively closed to off-route wheeled motorized travel, which are both failed conservation promises, and (c) available new information regarding recurring illegal motorized use and its potential effects on grizzly bears, which have not yet

been addressed.

129.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

acknowledges recurring illegal motorized use but argues that illegal

motorized use is not an "agency action" and therefore the Forest Service

refuses to reinitiate ESA consultation on the Forest Plan.  However, the

challenged agency action here is the Forest Plan; the triggers that require

reinitiation of consultation are set forth in 50 C.F.R. 402.16; those triggers

have been met in this case for the Forest Plan; and part of a consultation

must address "cumulative effects," 50 C.F.R. §402.12 (f)(4), which

expressly include "effects of future . . . private activities . . . that are

reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For

these reasons, recurring illegal motorized use and its impact on grizzly bears

must be addressed in reconsultation on the Forest Plan.

130.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

also states that "the effects of this use on grizzly bears are being considered

as part of the environmental baseline through the Forest Plan revision

consultation process."   However, "environmental baseline," 50 C.F.R. §

402.02, by definition does not include reasonably foreseeable future private

activities such as illegal motorized use by private actors.  Moreover, the

Forest Service's Biological Assessment for the Revised Forest Plan does not

33

in fact discuss the effect of recurring illegal motorized use on grizzly bears, nor does it even disclose the extent of the problem.  As of the date of the filing of this Complaint, there is no Biological Opinion for the Revised Forest Plan.

131.   For all of these reasons, the Forest Service or FWS must reinitiate ESA consultation on the Forest Plan.

SECOND CLAIM FOR RELIEF

*The Forest Service or FWS must reinitiate ESA consultation*

*on the Blackfoot Travel Plan.*

132.   All previous paragraphs are incorporated by reference.

133.   The Forest Service or FWS must reinitiate ESA consultation on the Blackfoot Travel Plan to address the following: (a) its violation of the annual monitoring report requirement, which is a violation of a non-discretionary requirement of the Incidental Take Statement, (b) its failure to ensure that restricted roads are effectively restricted and are not being used by wheeled motorized vehicles upon route closure, which is a failed conservation promise, and (c) available new information regarding recurring illegal motorized use and its potential effects on grizzly bears, which have not yet been addressed. Alternatively, the Forest Service or FWS must reinitiate ESA consultation on the Forest Plan itself to address

these issues in these areas.

134.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

acknowledges recurring illegal motorized use but argues that illegal

motorized use is not an "agency action" and therefore it would not reinitiate

ESA consultation.  However, the challenged agency action here is the

Blackfoot Travel Plan; the triggers that require reinitiation of consultation

are set forth in 50 C.F.R. 402.16; those triggers have been met in this case

for the Blackfoot Travel Plan; and part of a consultation must address

"cumulative effects," 50 C.F.R. §402.12 (f)(4), which expressly include

"effects of future . . . private activities . . . that are reasonably certain to

occur within the action area," 50 C.F.R. § 402.02.  For these reasons,

recurring illegal motorized use and its impact on grizzly bears must be

addressed in reconsultation on the Blackfoot Travel Plan.

135.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

also states that "the effects of this use on grizzly bears are being considered

as part of the environmental baseline through the Forest Plan revision

consultation process."   However, "environmental baseline," 50 C.F.R. §

402.02, by definition does not include reasonably foreseeable future private

activities such as illegal motorized use by private actors.  Moreover, the

Forest Service's Biological Assessment for the Revised Forest Plan does not

in fact discuss the effect of recurring illegal motorized use on grizzly bears, nor does it even disclose the extent of the problem. As of the date of the filing of this Complaint, there is no Biological Opinion for the Revised Forest Plan.

136.   Thus, the Forest Service's attempt to tier the Blackfoot Travel Plan consultation to the Revised Forest Plan consultation to avoid discussion of effects on grizzly bears from illegal motorized use fails because the Revised Forest Plan consultation does not address this issue, and in particular fails to address site-specific data regarding illegal motorized use in the Blackfoot Travel Plan area. *See e.g. Native Ecosystems Council v. Krueger*, 63 F. Supp. 3d 1246, 1253 (D. Mont. 2014), *aff'd* 883 F.3d 783 (9th Cir. 2018).

137.   For all of these reasons, the Forest Service or FWS must reinitiate ESA consultation on the Blackfoot Travel Plan.

THIRD CLAIM FOR RELIEF

*The Forest Service or FWS  must reinitiate ESA consultation*

*on the Divide Travel Plan.*

138.   All previous paragraphs are incorporated by reference.

139.   The Forest Service or FWS  must reinitiate ESA consultation on the Divide Travel Plan to address the following: (a) its violation of the annual monitoring report requirement, which is a violation of a non-discretionary

requirement of the Incidental Take Statement, (b) its failure to ensure that restricted roads are effectively restricted and are not being used by wheeled motorized vehicles upon route closure, which is a failed conservation promise, and (c) available new information regarding recurring illegal motorized use and its potential effects on grizzly bears, which have not yet been addressed. Alternatively, the Forest Service or FWS must reinitiate ESA consultation on the Forest Plan itself to address these issues in these areas.

140.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service acknowledges recurring illegal motorized use but argues that illegal motorized use is not an "agency action" and therefore it would not reinitiate ESA consultation.  However, the challenged agency action here is the Divide Travel Plan; the triggers that require reinitiation of consultation are set forth in 50 C.F.R. 402.16; those triggers have been met in this case for the Divide Travel Plan; and part of a consultation must address "cumulative effects," 50 C.F.R. §402.12 (f)(4), which expressly include "effects of future . . . private activities . . . that are reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For these reasons, recurring illegal motorized use and its impact on grizzly bears must be addressed in reconsultation on the Divide Travel Plan.

141.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

also states that "the effects of this use on grizzly bears are being considered

as part of the environmental baseline through the Forest Plan revision

consultation process."   However, "environmental baseline," 50 C.F.R. §

402.02, by definition does not include reasonably foreseeable future private

activities such as illegal motorized use by private actors.  Moreover, the

Forest Service's Biological Assessment for the Revised Forest Plan does not

in fact discuss the effect of recurring illegal motorized use on grizzly bears,

nor does it even disclose the extent of the problem.  As of the date of the

filing of this Complaint, there is no Biological Opinion for the Revised

Forest Plan.

142.   Thus, the Forest Service's attempt to tier the Divide Travel Plan

consultation to the Revised Forest Plan consultation to avoid discussion of

effects on grizzly bears from illegal motorized use fails because the Revised

Forest Plan consultation does not address this issue, and in particular fails to

address site-specific data regarding illegal motorized use in the Divide

Travel Plan area.  *See e.g. Native Ecosystems Council v. Krueger*, 63 F.

Supp. 3d 1246, 1253 (D. Mont. 2014), *aff'd* 883 F.3d 783 (9th Cir. 2018).

143.   For all of these reasons, the Forest Service or FWS must reinitiate ESA

consultation on the Divide Travel Plan.

## FOURTH CLAIM FOR RELIEF

*The Forest Service or FWS  must initiate or reinitiate ESA consultation on the*

*Elkhorns Travel Plan.*

144.   All previous paragraphs are incorporated by reference.

145.   New information indicates that grizzly bears may be present in the

Elkhorns.

146.   Grizzly bears may be affected by the Elkhorns Travel Plan.

147.   ESA consultation on grizzly bears for the Elkhorns Travel Plan is required

and it must address the effects of illegal motorized use on grizzly bears.

Alternatively, the Forest Service or FWS must reinitiate ESA consultation

on the Forest Plan itself to address this issue in this area.

148.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

acknowledges recurring illegal motorized use but argues that "[i]llegal road

use is not an authorized agency action."  However, the challenged agency

action here is the Elkhorns Travel Plan; the triggers that require initiation

and/or reinitiation of consultation have been met in this case; and part of a

consultation must address "cumulative effects," 50 C.F.R. §402.12 (f)(4),

which expressly include "effects of future . . . private activities . . . that are

reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For

these reasons, recurring illegal motorized use and its impact on grizzly bears

must be addressed consultation on the Elkhorns Travel Plan.

149.  In response to Plaintiff's 60-day notice of intent to sue, the Forest Service also states that "the effects of this use are being considered as part of the environmental baseline for initiation/reinitiation of these travel plans as well as being considered as part of the environmental baseline through the Forest Plan revision consultation process."   However, "environmental baseline," 50 C.F.R. § 402.02, by definition does not include reasonably foreseeable future private activities such as illegal motorized use by private actors. Moreover, the Forest Service's Biological Assessment for the Revised Forest Plan does not in fact discuss the effect of recurring illegal motorized use on grizzly bears, nor does it even disclose the extent of the problem.  As of the date of the filing of this Complaint, there is no Biological Opinion for the Revised Forest Plan.

150.  For all of these reasons, the Forest Service or FWS must initiate or reinitiate ESA consultation on the Elkhorns Travel Plan to address the effect of illegal motorized use on grizzly bears.

## FIFTH CLAIM FOR RELIEF

*The Forest Service or FWS must initiate or reinitiate ESA consultation on the*

*North Belts Travel Plan*

151.  All previous paragraphs are incorporated by reference.

152. New information indicates that grizzly bears may be present in the North Belts.

153. Grizzly bears may be affected by the North Belts Travel Plan.

154. ESA consultation on grizzly bears for the North Belts Travel Plan is required and it must address the effects of illegal motorized use on grizzly bears. Alternatively, the Forest Service or FWS must reinitiate ESA consultation on the Forest Plan itself to address this issue in this area.

155. In response to Plaintiff's 60-day notice of intent to sue, the Forest Service acknowledges recurring illegal motorized use but argues that "[i]llegal road use is not an authorized agency action."  However, the challenged agency action here is the North Belts Travel Plan; the triggers that require initiation and/or reinitiation of consultation have been met in this case; and part of a consultation must address "cumulative effects," 50 C.F.R. §402.12 (f)(4), which expressly include "effects of future . . . private activities . . . that are reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For these reasons, recurring illegal motorized use and its impact on grizzly bears must be addressed consultation on the North Belts Travel Plan.

156. In response to Plaintiff's 60-day notice of intent to sue, the Forest Service also states that "the effects of this use are being considered as part of the environmental baseline for initiation/reinitiation of these travel plans as well

as being considered as part of the environmental baseline through the Forest Plan revision consultation process." However, "environmental baseline," 50 C.F.R. § 402.02, by definition does not include reasonably foreseeable future private activities such as illegal motorized use by private actors. Moreover, the Forest Service's Biological Assessment for the Revised Forest Plan does not in fact discuss the effect of recurring illegal motorized use on grizzly bears, nor does it even disclose the extent of the problem. As of the date of the filing of this Complaint, there is no Biological Opinion for the Revised Forest Plan.

157. For all of these reasons, the Forest Service or FWS must initiate or reinitiate ESA consultation on the North Belts Travel Plan to address the effect of illegal motorized use on grizzly bears.

## SIXTH CLAIM FOR RELIEF

*The Forest Service or FWS  must initiate or reinitiate ESA consultation on the South Belts Travel Plan.*

158. All previous paragraphs are incorporated by reference.

159. New information indicates that grizzly bears may be present in the South Belts.

160. Grizzly bears may be affected by the South Belts Travel Plan.

161. ESA consultation on grizzly bears for the South Belts Travel Plan is

required and it must address the effects of illegal motorized use on grizzly

bears. Alternatively, the Forest Service or FWS  must reinitiate ESA

consultation on the Forest Plan itself to address this issue in this area.

162.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

acknowledges recurring illegal motorized use but argues that "[i]llegal road

use is not an authorized agency action."  However, the challenged agency

action here is the South Belts Travel Plan; the triggers that require initiation

and/or reinitiation of consultation have been met in this case; and part of a

consultation must address "cumulative effects," 50 C.F.R. §402.12 (f)(4),

which expressly include "effects of future . . . private activities . . . that are

reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For

these reasons, recurring illegal motorized use and its impact on grizzly bears

must be addressed consultation on the South Belts Travel Plan.

163.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service

also states that "the effects of this use are being considered as part of the

environmental baseline for initiation/reinitiation of these travel plans as well

as being considered as part of the environmental baseline through the Forest

Plan revision consultation process."   However, "environmental baseline,"

50 C.F.R. § 402.02, by definition does not include reasonably foreseeable

future private activities such as illegal motorized use by private actors.

Moreover, the Forest Service's Biological Assessment for the Revised

Forest Plan does not in fact discuss the effect of recurring illegal motorized

use on grizzly bears, nor does it even disclose the extent of the problem. As

of the date of the filing of this Complaint, there is no Biological Opinion for

the Revised Forest Plan.

164. For all of these reasons, the Forest Service or FWS must initiate or reinitiate

ESA consultation on the South Belts Travel Plan to address the effect of

illegal motorized use on grizzly bears.

SEVENTH CLAIM FOR RELIEF

*The Forest Service or FWS must reinitiate ESA consultation on the Rocky*

*Mountain Ranger District Travel Plans.*

165. All previous paragraphs are incorporated by reference.

166. The Forest Service or FWS must reinitiate ESA consultation on the Rocky

Mountain Ranger District Travel Plans to address (a) how the agencies'

assumption – that travel management regulations, the 2005 FS OHV

regulations that prohibit off-trail motorized travel, signs, and other road

restrictions would be effective – has proven false, which amounts to a failed

conservation promise, and (b) available new information regarding

recurring illegal motorized use and its potential effects on grizzly bears,

which have not yet been addressed. Alternatively, the Forest Service or

44

FWS must reinitiate ESA consultation on the Forest Plan itself to address these issues in these areas.

167.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service acknowledges recurring illegal motorized use in this area but argues that illegal motorized use is not an "agency action" and therefore it would not reinitiate ESA consultation.  However, the challenged agency action here is the Rocky Mountain Ranger District Travel Plans; the triggers that require reinitiation of consultation are set forth in 50 C.F.R. 402.16; those triggers have been met in this case for the Rocky Mountain Ranger District Travel Plans; and part of a consultation must address "cumulative effects," 50 C.F.R. §402.12 (f)(4), which expressly include "effects of future . . . private activities . . . that are reasonably certain to occur within the action area," 50 C.F.R. § 402.02.  For these reasons, recurring illegal motorized use and its impact on grizzly bears must be addressed in reconsultation on the Rocky Mountain Ranger District Travel Plans .

168.   In response to Plaintiff's 60-day notice of intent to sue, the Forest Service also states that "the effects of this use on grizzly bears are being considered as part of the environmental baseline through the Forest Plan revision consultation process."  However, "environmental baseline," 50 C.F.R. § 402.02, by definition does not include reasonably foreseeable future private

activities such as illegal motorized use by private actors.  Moreover, the

Forest Service's Biological Assessment for the Revised Forest Plan does not

in fact discuss the effect of recurring illegal motorized use on grizzly bears,

nor does it even disclose the extent of the problem.  As of the date of the

filing of this Complaint, there is no Biological Opinion for the Revised

Forest Plan.

169.    Thus, the Forest Service's attempt to tier the Rocky Mountain Ranger

District Travel Plans consultation to the Revised Forest Plan consultation to

avoid discussion of effects on grizzly bears from illegal motorized use fails

because the Revised Forest Plan consultation does not address this issue,

and in particular fails to address site-specific data regarding illegal

motorized use in the Rocky Mountain Ranger District Travel Plans area.

*See e.g. Native Ecosystems Council v. Krueger*, 63 F. Supp. 3d 1246, 1253

(D. Mont. 2014), aff'd 883 F.3d 783 (9th Cir. 2018).

170.    For all of these reasons, the Forest Service or FWS must reinitiate ESA

consultation on the Rocky Mountain Ranger District Travel Plans.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiff requests that this Court award

the following relief:

A.      Declare that the agencies' failures to initiate or reinitiate ESA consultation

on the plans listed above violate the law;

B.      Order the agencies to prepare lawful ESA consultations on the plans listed

above;

C.      Award Plaintiff its costs, expenses, expert witness fees, and reasonable

attorney fees under ESA; and

D.      Grant Plaintiff any such further relief as may be just, proper, and equitable.


Respectfully submitted January 8, 2021.



                              */s/ Rebecca K. Smith*
                              Rebecca K. Smith
                              PUBLIC INTEREST DEFENSE CENTER, PC

                              Timothy M. Bechtold
                              BECHTOLD LAW FIRM, PLLC


                              Attorneys for Plaintiffs