IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 21–05–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| LEANNE MARTEN, et al., | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment. (Docs. 26, 29.)  For the reasons stated herein, Plaintiff's motion will be granted, and Defendants' motion will be denied.

## BACKGROUND[1]

### **Procedural History**

The core of this litigation, and a common theme in this District, is motorized vehicle access and its impacts on grizzly bears.  Plaintiff Alliance for the Wild Rockies ("Plaintiff") filed this lawsuit in January 2021, challenging under the Endangered Species Act ("ESA") the United States Forest Service's ("USFS") and United States Fish and Wildlife Service's ("FWS") (collectively, "Defendants")

---

[1] The facts discussed in this section are undisputed unless otherwise noted.  (*See generally* Doc. 31; Doc. 33.)

failure to reinitiate ESA consultation on the Helena-Lewis & Clark National Forest Plan, Blackfoot Travel Plan, Divide Travel Plan, and Rocky Mountain Ranger District Travel Plans, and failure to initiate or reinitiate ESA consultation on the Elkhorns Travel Plan, North Belts Travel Plan, and South Belts Travel Plan.  (Doc. 1 at 2.)  After this litigation was initiated, Defendants issued a Revised Forest Plan Biological Opinion ("BiOp") for the Helena-Lewis and Clark National Forest, and Plaintiff filed an amended complaint challenging the adequacy of that BiOp.  (Doc. 3 at 2.)  Defendants filed a motion to dismiss and, in the alternative, motion to stay (Doc. 5), but Defendants withdrew that motion after they issued a BiOp on three travel plans at issue in the litigation.  (Doc. 11.)  After FWS issued a new Revised Forest Plan BiOp in January 2022, Plaintiff ultimately filed a third amended complaint (Doc. 20), which is the operative complaint in this matter.  The operative complaint amended Plaintiff's claims to challenge the January 2022 BiOp and eliminated Plaintiff's challenges to the failure to initiate consultation on the Elkhorns Travel Plan, North Belts Travel Plan, and South Belts Travel Plan, which Plaintiff conceded were moot following Defendants' issuance of the BiOp for those travel plans.  (Doc. 20 at 2, 16.)

### Grizzly Bears on the Helena-Lewis and Clark National Forest

On the Helena-Lewis and Clark National Forest, the Forest Plan designates the Rocky Mountain Range (which corresponds to the Rocky Mountain Ranger

District, P3:83169–70, 83221) and a portion of the Upper Blackfoot as the "Primary Conservation Area"[2] for grizzly bears, which is identical to the Northern Continental Divide Ecosystem Grizzly Bear Recovery Zone ("NCDE").  P3:83036. USFS expects the Primary Conservation Area "to function as a source population with continual occupancy by grizzly bears." *Id.*  Within each bear management subunit of the Primary Conservation Area, the Forest Plan prohibits net decreases to the baseline for secure core habitat and net increases to the baseline for open motorized route density or total motorized route density on National Forest System lands during the nondenning season.  P3:83043, 83366.

The Forest Plan designates the rest of the Upper Blackfoot and a portion of the Divide as "Management Zone 1" for grizzly bears, which USFS expects to have continual occupancy by grizzly bears, but at lower densities than in the Primary Conservation Area.  P3:83036.  In Zone 1, the Forest Plan prohibits a net increase above the baseline in density of motorized routes—both roads and trails— open to public motorized use during the nondenning season on NFS lands. P3:83041, 83366.

The Forest Plan designates the remaining portion of the Divide, the Elkhorns and Big Belts, and a few acres of the Upper Blackfoot as "Management Zone 2" for grizzly bears, where USFS's objective is to continue existing recreation and

---

[2] FWS refers to "Primary Conservation Area" and "recovery zone" interchangeably.  FWS11.

resource management while maintaining the opportunity for grizzly bears to move between the NCDE and other ecosystems.  P3:083036.  The other mountain ranges on the Forest—the Castles, Crazies, Little Belts, and Highwoods—are classified as Management Zone 3 for grizzly bears, where USFS expects that long-term survival and occupancy of grizzly bears will not occur because of lack of sufficient suitable habitat.  *Id.*

FWS has long found that "[r]oads probably pose the most imminent threat to grizzly habitat today . . . .  The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears."  O3_15:34445–46.  Grizzly bears are displaced from open and closed roads; "[a]voidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears" in an area observed in a research study.  O3_15:034574.  In that same study, "[f]emales with cubs remained primarily in high, rocky, marginal habitat far from roads. . . .  This research demonstrated that a significant portion of the habitat in the study area remained unused by female grizzlies for several years.  Since adult females are the most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population."  *Id.*  The study found that "survivorship of offspring of females that lived in unroaded, high elevation habitat was lower than that

4

recorded in other study areas" in the NCDE, demonstrating to the researchers that "the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads." *Id.* Current peer-reviewed science finds that roads pose significant threats to grizzly bear survival: "Of all the covariates [researchers] examined, the amount of secure habitat and the density of roads in nonsecure habitat on public lands had the greatest effect on grizzly bear survival." O2_51:30195.

Although the parties dispute the extent and significance of unauthorized motorized access on the Forest, Defendants acknowledge that unauthorized motorized use occurs. C2:8672. Plaintiff's claims in this lawsuit focus on Defendants' consideration of such unauthorized motorized use and the effectiveness of efforts to curtail it. In short, Plaintiff contends:

(1) The Forest Plan BiOp fails to adequately address illegal motorized use on the Forest and its potential effects or cumulative effects on grizzly bears;

(2) Defendants must reinitiate ESA consultation on the Blackfoot Travel Plan and Divide Travel Plan to address:

(a) USFS's violation of the annual monitoring report requirement, which is a violation of a non-discretionary requirement of the Incidental Take Statement of each Travel Plan;

5

(b)  USFS's failure to ensure that restricted roads are effectively

restricted and are not being used by wheeled motorized vehicles upon

route closure, which is a failed conservation promise; and

(c)  available new information regarding recurring illegal motorized

use and its potential effects on grizzly bears, which have not yet been

addressed; and

 (3)  Defendants must reinitiate ESA consultation on the Rocky Mountain

Ranger District Travel Plans to address:

(a)  how the agencies' assumption that travel management regulations

would be effective has proven false, which amounts to a failed

conservation promise; and

(b)  available new information regarding recurring illegal motorized

use and its potential effects on grizzly bears, which have not yet been

addressed.

(Doc. 20 at 40–47.)

Additional facts are discussed as they become relevant below.

## LEGAL STANDARDS

## **Endangered Species Act (ESA)**

The ESA declares a national policy of conserving endangered and threatened

species.  16 U.S.C. § 1531(c).  In enacting the ESA, Congress intended to "halt and

reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).  In doing so, Congress adopted an approach of "institutionalized caution" that affords endangered species "the highest of priorities," even over the primary missions of federal agencies.  *Id.* at 185, 194.  To accomplish its purpose, the ESA requires that all federal agencies "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of such species' critical habitat.  16 U.S.C. § 1536(a)(2).

The ESA mandates that federal agencies request information from the Secretary of the Interior on the potential presence of species listed or proposed to be listed as threatened or endangered in the area of the proposed agency action.  16 U.S.C. § 1536(c)(1).  If such species may be present in the area, the agency proposing the action must prepare a Biological Assessment ("BA") to identify any endangered or threatened species that is likely to be affected by the agency's proposed action.  *Id.*  If the BA concludes that the proposed project is likely to adversely affect a listed species, the action agency must then engage in informal or formal consultation with FWS.  *Forest Guardians v. Johanns*, 450 F.3d 455, 457–58 (9th Cir. 2006).  If the agency concludes in the BA or through informal

consultation that the action is not likely to adversely affect a listed species or critical habitat, and FWS concurs, the consultation process ends as to that species. *See* 50 C.F.R. § 402.14(b)(1).  Otherwise, formal consultation must commence, which requires FWS to issue a BiOp evaluating the effects on the listed species and making a "jeopardy" or "no jeopardy" determination.  50 C.F.R. § 402.14(h)(iv).

When an action agency and FWS engage in formal consultation, the ESA's implementing regulations require FWS to evaluate the current status and environmental baseline of the listed species or critical habitat and impose "an affirmative duty to consider cumulative effects."  *Conservation Congress v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013); 50 C.F.R. § 402.14(g)(3) (requiring FWS to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat")  Cumulative effects are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.  The BiOp must include, among other things, a summary of the information on which the opinion is based, a detailed discussion of the environmental baseline of the listed species and critical habitat, and a detailed discussion of the effects of the action on listed species or critical habitat.  50 C.F.R. § 402.14(h)(1).  FWS's jeopardy determination must "[a]dd the effects of the

action and cumulative effects to the environmental baseline[.]"  50 C.F.R.

§ 402.14(g)(4).

If the BiOp concludes that the proposed action is "likely to jeopardize the

continued existence of a listed species or result in the destruction or adverse

modification of critical habitat" the BiOp must also propose reasonable and

prudent alternatives and measures that could minimize or avoid the adverse effects.

*Id.* §§ 402.14(g)(5), (h)(2).  If, however, the BiOp concludes that the action or the

implementation of any reasonable and prudent alternatives and the resultant

incidental take of listed species will not violate the ESA, the BiOp must include an

Incidental Take Statement, which, among other requirements, specifies the amount

or extent of such incidental taking on the species, specifies reasonable and prudent

measures that the Director of FWS considers necessary or appropriate to minimize

such impact, and sets forth terms and conditions including reporting requirements

that must be complied with by the action agency to implement those minimization

measures.  *Id.* § 402.14(i)(1).  "In order to monitor the impacts of incidental take,"

the action agency "must report the progress of the action and its impact on the

species to [FWS] as specified in the incidental take statement."  *Id.* § 402.14(i)(3).

"For a framework programmatic action, an incidental take statement is not required

at the programmatic level;" rather, any incidental take resulting from an action

taken under the program "will be addressed in subsequent section 7 consultation, as appropriate." *Id.* § 402.14(i)(6).

The implementing regulations establish requirements for reinitiation of consultation, as well.  Reinitiation of consultation is required if, *inter alia*, "the amount or extent of taking specified in the incidental take statement is exceeded," "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion[.]"  50 C.F.R. § 402.16(a).

Regarding subsection (a)(2), the Ninth Circuit has held that, when an action agency learns that its action may affect listed species in a manner or to an extent not previously considered because anticipated mitigation efforts have been delayed or may not take place at all, the action agency must reinitiate consultation if FWS found those mitigation efforts necessary to minimize the project's effects.  *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987), *abrogated on other grounds as recognized in Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015).  "However, the mere existence of new information does not necessarily trigger reinitiation of consultation. . . .  The crux of the matter is

whether the new information reveals effects that were not previously considered." *All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1204 (D. Mont. 2019).

Regarding subsection (a)(3), the Ninth Circuit has held that FWS must "reexamine altered projects to ensure that any changes will not place species in jeopardy or risk degradation to critical habitat[,]" and an action agency is not insulated by a BiOp's incidental take statement (and thus becomes subject to suit under the ESA) if it fails to reinitiate consultation "despite the failure of promised conservation measures[.]" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012).

### **Administrative Procedure Act (APA)**

The APA provides for judicial review of "agency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. Courts review agency decisions alleged to have violated the ESA under the standard of review set forth in the APA in 5 U.S.C. § 706(2). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

The APA's standard permits a court to hold agency action, findings, and conclusions unlawful and set them aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a narrow standard. *Motor Vehicle Mfrs. Ass'n. v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency," especially where the agency's decision "implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

In reviewing agency decisions under the arbitrary and capricious standard, the Court considers whether the decision was "'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). The decision is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* An "agency's action must be upheld, if at all, on the basis articulated by the agency itself"; the Court "may not accept . . . counsel's post hoc rationalizations for agency action." *Id.* at 50 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

ANALYSIS

## I.    Standing

Defendants contend that Plaintiff lacks standing to pursue its claims because Plaintiff fails to establish that its or its members' interests will be harmed by Defendants' alleged failures and because Plaintiff fails to address how reinitiation of consultation for the Forest Plan BiOp or Travel Plans would redress any alleged harm.  (Doc. 30 at 19–22.)

"To establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision."  *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014).  "One who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressibility."  *Id.* (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  The Ninth Circuit has held that violations of the ESA's consultation requirement "constitute a procedural injury for standing purposes."  *Id.* at 783.  "For this reason, to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests."  *Id.*  "An association has standing to bring suit on behalf of its members

when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63.

As a threshold matter, Plaintiff is correct that it need not submit to the Court affidavits or other evidence sufficient to survive summary judgment until a motion for summary judgment is filed. *Id.* at 561. And Plaintiff did precisely that here, submitting a declaration by Michael Garrity, the Executive Director of Alliance for the Wild Rockies. (Doc. 32-1.) Viewing this evidence in the light most favorable to Plaintiff, Mr. Garrity's declaration establishes Plaintiff's standing because he and Plaintiff's members regularly visit the Helena-Lewis and Clark National Forest and intend to continue to do so for various activities, including hiking, camping, and quiet contemplation in nature, and they have "vested concrete esthetic, recreational, scientific, spiritual, vocational, and educational interests" in grizzly bears and their habitat, which they look for when visiting the Forest. (*Id.* ¶¶ 3–4.) The declaration further establishes that those interests will be harmed by Defendants' failure to comply with the ESA because Defendants' failure to rely on

14

the best available scientific information means that their road density and core habitat calculations are incorrect, preventing the Forest from meeting scientific thresholds for road density for this grizzly bear population. (*Id.* ¶¶ 6–7.) The declaration asserts that reinitiation of consultation could provide greater protections for grizzly bears and thus redress Plaintiff's injury, such as if Defendants (1) develop a new method of calculating road density, which ultimately could require greater mitigation efforts when USFS seeks to build new roads or prevent those roads from being built at all, the end result of which would be a net reduction in roads; (2) establish better monitoring requirements; and (3) establish accountability measures, such as triggers that automatically implement increased protections for grizzly bears, when USFS fails to comply with monitoring requirements. (*Id.* ¶¶ 10–12.) The declaration further notes that Plaintiff must expend resources to file litigation against Defendants regarding ineffective road closures and inaccurate road density calculations based on Defendants' failure to address unauthorized motorized use. (*Id.* ¶ 7.)

In reply, Defendants argue that these injuries amount to generalized interests in ensuring the government's compliance with correct procedures and fails to establish the requisite causal connection between Defendants' conduct and Plaintiff's injuries. (Doc. 34 at 23–26.) The Court disagrees. The declaration expressly connects the dots between Defendants' conduct—inaccurate road density

calculation and inadequate monitoring—and Defendants' inability to meet scientific thresholds supporting the survival of the relevant population of grizzly bears, and it establishes that Plaintiff and its members have concrete interests in those grizzly bears' survival.  To be sure, the fact that the plans at issue are programmatic documents creates some temporal and causal distance between Defendants' conduct and on-the-ground activities directly affecting bears, but this gap is easily closed because project-specific analyses often tier to these kinds of programmatic documents and/or rely upon the baselines they set to determine project-specific requirements and to estimate projects' impacts on listed species or critical habitat.  *See, e.g.*, *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) (observing that forest plans "have ongoing effects extending beyond their mere approval" because they set forth resource management criteria that may affect listed species or critical habitat); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, --- F. Supp. 3d ----, No. CV 22-91-M-DLC-KLD, 2023 WL 3052299, at *5, 8–12 (D. Mont. Apr. 24, 2023) (providing example of project-specific BiOp that relied heavily on standards evaluated in Forest Plan BiOp); *cf. All. for the Wild Rockies v. Gassmann*, No. CV 21-105-M-DLC-KLD, 2023 WL 4172930, at *12–15 (June 26, 2023) (discussing tiering in NEPA context).  If, as Plaintiff asserts, the programmatic documents rest on fundamental flaws that could pose threats to the species when future on-the-ground projects rely upon those flawed analyses, a

16

challenge directly to the programmatic documents is appropriate—particularly in
light of consistent case law rejecting efforts to challenge the substance of
programmatic documents via their project-specific implementation. *See, e.g.*,
*Gassmann*, 2023 WL 4172930, at *9–11 (agreeing with Defendants' argument that
continuation of status quo set forth in Forest Plan is not agency action under ESA).

Accordingly, the Court finds that Plaintiff has standing to pursue the claims
it raises in this action, and Defendants' motion for summary judgment on this basis
will be denied.

## II.   Forest Plan Biological Opinion

### A.   Summary of Forest Plan BiOp's Analysis Regarding Motorized Access

As relevant here, FWS analyzed motorized access and its impact on grizzly
bears in three sections of the Forest Plan BiOp: the environmental baseline,
FWS8–18, effects of the action, FWS38–50, and cumulative effects, FWS68–69.

In discussing access management in the environmental baseline, FWS
acknowledged that it previously had relied on linear motorized route density or an
estimate of low, medium, or high levels of motorized use to analyze impacts of
motorized use on grizzly bears outside of the Recovery Zone, and the agency
explained that recent research indicated that "distance to roads and location of
roads in relation to certain habitats may be as or more important than road density

17

in predicting impacts to bears."  FWS10.  Accordingly, FWS incorporated secure habitat into its analysis of the environmental baseline because it "more adequately represents the potential effects to grizzly bears related to motorized access as it provides a more accurate indication of the spatial mix of motorized routes and secure habitat."  *Id.*

FWS defined areas of secure habitat as follows.  Within subunits of the recovery zone, "areas more than 500 meters from an open or gated motorized route and greater than 2,500 acres in size are defined as 'secure core.'"  FWS11.  Outside the recovery zone, "areas more than 500 meters from any motorized route and greater than 2,500 acres in size . . . are defined as 'secure habitat.'"  *Id.*  FWS noted that patches of habitat of less than 2,500 acres can provide habitat for grizzly bears as well, but such patches of habitat would be analyzed in the future in the context of site-specific and project-level analyses.  *Id.*

The NCDE Grizzly Bear Amendments, which the BiOp incorporates by reference, FWS11, provide the most up-to-date route density definitions:

> Open Motorized Route Density (OMRD) includes: all Federal, State, and Tribal roads and motorized trails that are open to public wheeled use for any part of the non-denning season, along with motorized routes that are only closed by signage or map. . . .

> Total Motorized Route Density (TMRD) includes: all Federal, State, and Tribal roads and motorized trails, whether they are open or closed to motorized wheeled public access. . . .

18

FWS2949.  Within the recovery zone, OMRD also includes roads that are closed yearlong by gate closure but receive high administrative use and roads or trails open to motorized use (e.g., ATV and motorcycle use) anytime during the non-denning season.  FWS2952, 2954.  Closed roads included in TMRD include roads closed yearlong by gate closure and roads closed yearlong by physical barrier such as a berm or rocks.  FWS2952–53.  Secure core calculations account for all OMRD roads, all TMRD roads except those closed yearlong by a physical barrier, and highways, county/city roads, and private roads that are not included in OMRD and TMRD.  *Id.*  Finally, two categories of roads are not included in calculating OMRD, TMRD, or secure core: (1) roads closed yearlong and that are naturally revegetated, whose entrance has been obliterated, or where a bridge or large culvert has been removed—*i.e.*, roads that are impassable to all wheeled motorized vehicles; and (2) decommissioned or historical roads, which have been treated in a manner so as to no longer function as a road (such as by recontouring to original slope or placing debris) and must be impassable to all wheeled motorized vehicles, and which are "no longer on the system."  FWS2943, 2953–54.

"Within the recovery zone, research benchmarks for OMRD, TMRD, and secure core describe that adverse effects to grizzly bears are likely to occur when OMRD exceeds 1 mile per square mile in more than 19 percent of the subunit, TMRD exceeds 2 miles per square mile in more than 19 percent of the subunit, and

19

secure core is not at least 68 percent of the subunit during the non-denning period."
FWS12.  Only three subunits on the Forest fall below the secure core benchmark,
and FWS attributes that fact to those subunits being less than 75 percent Forest
ownership and motorized access on non-Forest land.  FWS13.

As noted above, in Zone 1, OMRD (calculated as linear miles over the entire
area, referred to as linear motorized route density) cannot increase above the 2011
baseline unless adjusted through consultation.  FWS13.  The baseline density was
1.6 miles per square mile, and although measurements have varied throughout the
years, linear motorized route density has remained below that baseline.  *Id.*  Part of
the reason for variation is that road status may be updated in the motorized route
information database based on field validation, remote imagery, and staff
knowledge.  *Id.*

Motorized access management is not required in Zones 2 or 3, but secure
habitat is calculated for all zones.  FWS14.  In calculating secure habitat, "all
existing routes are buffered, regardless of whether they are legally open or
restricted to public travel, when delineating secure habitat outside the recovery
zone."  *Id.*  Also buffered were all non-Forest lands.  *Id.*  The agencies took a
different approach, however, when it comes to undetermined roads:

> Some routes within the action area are defined as undetermined.
> Undetermined routes include old roads used for past land management
> activities that still remain on the landscape and user-created roads that
> have  generally  been  developed  without  agency  authorization,

environmental analysis, or public involvement. Accordingly, undetermined routes are not considered an open route and are not part of the Forest's road system. . . . In many cases, undetermined routes have existed for many years, and thus are part of the environmental baseline from which grizzly bears have been experiencing effects. Thus, while documenting undetermined routes offer a more accurate representation of the conditions on the ground, it does not necessarily represent new effects to grizzly bears.

FWS15.

The BiOp's discussion of illegal motorized use within the environmental baseline section spans about two full pages. FWS16–18. It notes that the Forest has previously experienced chronic unauthorized motorized access, primarily "in areas that are more open such as the north end of Big Belts or in areas where violators can skirt gates, including a few locations in the Strawberry Butte area of the Elkhorn Mountains." FWS16. The BiOp represents that most incidents are isolated and short term, and that at the time the BiOp was issued, "the Forest does not currently have any known, recurring illegal use." FWS17. Accordingly, FWS expected minimal levels of illegal motorized use. *Id.*

The environmental baseline section of the BiOp ultimately concludes:

While effects to grizzly bears may occur as a result of illegal motorized access on the Forest, it is the Service's opinion that such effects are reasonably uncertain. Information as to the length, duration, amount of illegal use, type of use, and location, among other conditions, is and will continue to be unknown. As such, the Service and the Forest are not able to calculate the extent of effects to individual grizzly bears. However, it is our opinion that the effects of any illegal motorized access on the grizzly bear population is likely low as evidenced by the NCDE grizzly bear population status, including an increasing number

21

of grizzly bears, an expansion of the distribution of grizzly bears, and an estimated positive population trend.

FWS17–18.

In the Effects of the Action section, FWS acknowledges that recent research "found that motorized access affects grizzly bears at the individual level by effecting habitat use, home-range selection and the ability to move across the landscape. The same study concluded that effects of motorized access on individual bears also results in effects at the population level due to habitat fragmentation, and decreased survival and reproductive rates." FWS38. The BiOp also acknowledges that grizzly bears that learn to avoid motorized routes "may not change this resultant avoidance behavior for long periods after road closures. Even occasional human-related vehicle noise can result in annoying grizzly bears to the extent that they continue to avoid roaded habitat." FWS39. Numerous studies indicate that "[g]rizzly bears were consistently displaced from roads and habitat surrounding roads, often despite relatively low levels of human use[.]" *Id.* Researchers likewise have found that "learned avoidance behavior could persist for more than one generation of grizzly bears before grizzly bears again utilize habitat associated with closed roads." FWS40. FWS also cited "grizzly bear habitat use data from the Yellowstone ecosystem," which showed that "secure habitat and road densities outside of secure habitat were important predictors of grizzly bear survival[.]" FWS42.

The BiOp's discussion of motorized access in the Cumulative Effects section spans one paragraph:

> As described in the baseline section above, any private entity's non-compliance with the Forest's access management is an illegal activity. While future illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not considered a Forest (federal) action. These, and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for potential cumulative effects. Also described above, while cumulative effects to grizzly bears may occur as a result of illegal motorized access, the information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unknown until such time that illegal use is found. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

FWS68–69. Notably, this paragraph is identical—word for word—to the analysis in the cumulative effects section of the BiOp for the Knotty Pine Project on the Kootenai National Forest. *Ctr. for Biological Diversity*, 2023 WL 3052299, at *8. This Court found that the plaintiffs in that case were likely to succeed on the merits of their claim that such analysis violated the ESA and APA. *Id.* at *6–12.

B.      **Analysis**

In its motion for summary judgment, Plaintiff argues that FWS violated its obligations under the ESA because it "did not seek out, disclose, and meaningfully analyze the effects and/or cumulative effects of pervasive illegal motorized use on grizzly bears across the Forest."  (Doc. 27 at 7.)  In particular, Plaintiff contends that the BiOp failed to disclose and meaningfully analyze three categories of data: "(1) hundreds of law enforcement records of illegal motorized use across the Forest, (2) the 57% failure rate of Forest Service road closures according to the Forest Service's own monitoring, and (3) hundreds of miles of roads that were closed on paper by Travel Plans, including illegal roads, but are still physically open to motorized use."  (*Id.* at 8.)  Plaintiff argues that "[w]ithout disclosure of this data, and without meaningful analysis of this available information in the environmental baseline, effects, and/or cumulative effects sections, the jeopardy analysis of the Revised Forest Plan Biological Opinion is invalid."  (*Id.*)

Defendants respond that the Forest Plan BiOp adequately considered motorized access on the Forest and reasonably concluded that the Forest Plan was not likely to jeopardize the continued existence of the grizzly bear.  (Doc. 30 at 15– 31.)  They argue that "[t]he agencies consider motorized use on anything other than a road designated for public motorized use, whether or not the road has a physical closure, to be unauthorized.  I2_1:013512.  FWS's analysis of illegal use

24

thus incorporates all three categories of information" cited by Plaintiff.  (Doc. 30 at 16–17 n.3.)  Additionally, Defendants argue that (1) Plaintiff fundamentally misunderstands FWS's methodology for evaluating the effects of motorized access on grizzly bears, which included the Forest Plan's effects on secure habitat and secure core, not just open motorized road density; (2) Plaintiff manipulates record data to quantify a rate of unauthorized use of roads on the Forest despite FWS reasonably concluding that it lacked sufficient information to do so; and (3) FWS fully evaluated the status of ongoing travel plans, which are programmatic and encompassed within the Forest Plan action area.  (*Id.* at 17.)

The parties' briefing raises a threshold issue of whether the issues Plaintiff identifies concerning FWS's analysis—which Defendants characterize as focusing narrowly on road density—is foreclosed by FWS's habitat-focused methodology.  (Doc. 27 at 12; Doc. 30 at 18–20.)  Defendants argue that FWS's analysis focuses on measuring secure core and secure habitat—both of which exclude land within 500 meters of open *or* restricted motorized routes—rather than road density.  (Doc. 30 at 18–20.)  As a result, they contend, "all roads are excluded from estimates of secure habitat and secure core.  Thus, even if FWS had given greater weight to Plaintiff's interpretation of illegal road use (and purported ineffectiveness of road closures), the analysis would have remained the same because the effects of all roads, whether open or closed, are assessed."  (*Id.* at 20.)  However, as Plaintiff

notes in reply (Doc. 32 at 15–16), this characterization is not entirely accurate; secure core and secure habitat do not account for decommissioned roads, and secure core does not account for roads closed yearlong by a physical barrier (e.g., earthen berm). FWS11; FWS2952–53. And neither secure habitat nor secure core appears to account for unauthorized motorized access occurring in areas without known routes, e.g., over-land travel, or on undetermined routes. Given Plaintiff's identification of data indicating that decommissioned roads remain on the landscape and physical barrier closures are sometimes ineffective, each of which could affect calculations of secure habitat, Defendants' methodology argument is unsuccessful.

With that threshold issue resolved, the essential question presented concerning the Forest Plan BiOp is whether the BiOp adequately assessed the environmental baseline and cumulative effects to reach its no jeopardy conclusion. The Court concludes that it did not.

As noted above, this is not the first time the Court has rejected "the apparently boilerplate assertion that has become familiar to the Court in recent years: because unauthorized motorized access is unpredictable, its effects on grizzly bears are unknowable." *Ctr. for Biological Diversity*, 2023 WL 3052299, at *10. This Court has previously faulted Defendants for "relying on factual assumptions the agencies *know* to be incorrect to dodge their statutory and

26

regulatory duties to obtain, disclose, and analyze the best scientific and commercial data available" in assessing cumulative effects, *All. for Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022, 1032 (D. Mont. 2022), and their "reliance on the temporally and spatially disparate (and thus purportedly unpredictable) effects of motorized use" because it "fails to consider an important aspect of the problem and offers an explanation for such failure that runs counter to the detailed evidence gathered and provided by USFS and third parties regarding unauthorized motorized access and closure failures[,]" *Ctr. for Biological Diversity*, 2023 WL 3052299, at *10.  The case currently before the Court presents both issues.

Plaintiff identifies several categories of evidence known to USFS and disclosed to FWS by USFS or by Plaintiff concerning unauthorized motor vehicle access, failures of road closures, and roads that were supposed to be closed according to travel plans on the Forest that are still physically open.  The 2014 to 2019 law enforcement data concerning illegal motorized use—which Defendants did not seek, but rather Plaintiff had to obtain via FOIA request and subsequently disclose to Defendants—provides detailed information, including latitudinal and longitudinal location, for each identified violation.  C1:8656–67.  USFS acknowledged in its response to Plaintiff's notice of intent to sue that these data indicated some recurring illegal road use and stated that such use would be addressed in the environmental baseline of the Forest Plan BiOp.  C2:8670.

Although the BiOp did acknowledge previous chronic violations in the north end of the Big Belts and the Strawberry Butte area of the Elkhorn Mountains and noted that the Forest has placed physical barriers to prevent gate-skirting and sometimes bolstered surveillance, FWS16–17, a review of the data before the agencies indicates that this discussion did not acknowledge many other areas where repeated violations were documented, C1:8656–67.  And, significantly, despite Plaintiff demonstrating in March 2020 that these data were available, Defendants did not seek to collect any additional updated law enforcement data concerning unauthorized motorized access or incorporate any analysis of such data into the 2021 BiOp.  Rather, FWS simply asserted that "the Forest does not currently have any known, recurring illegal use."  FWS17.

With respect to road closure effectiveness data, the parties vigorously dispute the significance of documented closure failures and the rate of such failures.  What cannot be disputed based on USFS's own monitoring data is that roads deemed "closed" with no physical barrier or gate to enforce the closure were much more likely to be deemed ineffective closures by USFS or to have documented recent use based on vehicle tracks, but some physically barriered or gated roads also failed according to these metrics.  G3_11524–28; F1_40:11086– 90.  Notably, Defendants' calculation method for OMRD accounts for the relative ineffectiveness of roads closed without a gate or barrier in the recovery zone and in

28

Zone 1 by including such roads in OMRD.  FWS2949.  And in Zones 2 and 3, all

existing routes are buffered to calculate secure habitat unless they are bermed.

FWS14, 17.  Accordingly, Defendants partially account for documented closure

failures in their methodology.  However, the BiOp "assume[s] that, when used,"

closure devices recognized as effective by the IGBC—i.e., gates and berms—"will

be effective[.]"  FWS17.  The closure monitoring data demonstrate that this

assumption is incorrect, which fundamentally calls into question the reliability of

Defendants' assessment of the environmental baselines in the recovery zone and

Zone 1, each of which rely in whole or in part upon OMRD—which in turn relies

upon the assumed effectiveness of gates and physical barriers—to estimate impacts

of motorized use on grizzly bears.

 Finally, Plaintiff identifies hundreds of miles of roads that remain open

despite their required restriction or decommissioning under existing Travel Plan

decisions.  F3:11335 (76 miles of roads with no closure device identified as

"restricted" in Forest's transportation database under Divide Travel Plan);

F3:11337 (38 miles of roads with no closure device identified as "restricted" in

Forest's transportation database under Blackfoot Non-Winter Travel Plan,

including 19 miles within NCDE); E6:10927 (36.5 miles of motorized routes to be

restricted seasonally or yearlong that have not yet been gated, bermed, or

decommissioned under Elkhorn Mountains Travel Plan); E6:10928 (3.5 miles of

motorized routes yet to be decommissioned and 74.2 miles yet to be gated or

bermed under the North Belts Travel Plan); E6:10930 (641.4 miles of motorized

routes to be restricted seasonally or yearlong that have not yet been gated, bermed,

or decommissioned under the Little Belts Travel Plan); E6:10931 (78 miles of

motorized routes that have not yet been gated, bermed, or decommissioned under

the North Belts Travel Plan).  Most glaringly problematic are the Divide and

Blackfoot roads identified in Forest databases as "restricted" that do not yet have

closure devices, which under Defendants' own analysis should be analyzed as open

for purposes of calculating OMRD in the recovery zone and Zone 1.  FWS2949.

Defendants assert that they accounted for all of these "closed-on-paper" roads by

noting in the BiOp that some closures would not utilize closure devices and by

calculating secure habitat outside of the recovery zone by excluding all existing

motorized routes, regardless whether they are open or closed.  (Doc. 30 at 29–31.)

But neither the BiOp nor the briefing addresses the impact of these "closed-on-

paper" routes on calculations of OMRD, secure habitat, or secure core within the

recovery zone or Zone 1, despite the presence of some of these roads within the

recovery zone.  F3:11337.  Nor do Defendants address how yet-to-be-

decommissioned routes factor into the agencies' analysis, which is significant

because the agencies treat decommissioned routes as "no longer on the system"

and do not factor them into secure habitat analysis.  FWS2943, 2953–54.

Likewise, the BiOp states that bermed roads are not included in secure habitat calculations, FWS17, but it is not at all clear how yet-to-be-bermed roads are treated.  Thus, even assuming that Defendants' secure-habitat-only measurement of effects on grizzly bears is supported by the best available science, *but see All. for the Wild Rockies v. Gassmann*, No. CV 21-105-M-DLC, 2023 WL 4172930, at *21 (D. Mont. June 26, 2023) ("[T]his approach ignores the interplay between secure habitat and road density . . . as predictors of grizzly bear survival."), this measurement fails to account for the data identified by Plaintiff.

In sum, the Court agrees with Plaintiff that the Forest Plan BiOp offers "an explanation for its decision that runs counter to the evidence before the agency" and therefore is arbitrary and capricious insofar as it assumes the effectiveness of closure devices; claims inability to account for the effects of unauthorized motorized access despite USFS's monitoring and databases, which demonstrate capacity to account for fluctuating conditions and new information; and fails to account for inaccuracies in how roads are classified in the Forest's database despite data showing differing on-the-ground conditions.  *State Farm*, 463 U.S. at 43.

## III.   Reinitiation of Consultation on Travel Plans

Plaintiff contends that Defendants must reinitiate ESA consultation as to the Divide Travel Plan, the Blackfoot Travel Plan, and the Rocky Mountain Ranger District Travel Plans pursuant to 50 C.F.R. § 402.16(a)(2) and (3).  Defendants

respond that Plaintiff does not identify any effects of implementing these travel plans which have not already been considered in the original consultation documents, but even if Plaintiff had demonstrated such effects, Defendants "properly discharged any obligation to address new information related to illegal road use in the Forest Plan BiOp[.]" (Doc. 30 at 31.) This Court's decision that the Forest Plan BiOp violated the ESA and APA in its consideration of unauthorized motorized access disposes of Defendants' second contention, so the Court addresses only Defendants' travel-plan-specific contentions below.

### A.    Divide Travel Plan

As relevant here, the Divide Travel Plan BiOp ("Divide BiOp") proposed using "existing levels of access management and the levels of access management proposed under the Travel Plan as [FWS's] surrogate measure of incidental take." I1_2:13407. As part of its incidental take statement, the Divide BiOp required the following implementation terms and conditions to "[r]educe the potential for displacement of grizzly bears within the action area": "The Forest shall assure that restricted roads are effectively restricted and are not being used by wheeled motorized vehicles upon route closure" and "shall assure that closed routes used for administrative purposes are gated to the public and use is limited to Forest personnel, permittees, or contractors." I1_2:13409. The Divide BiOp also implemented the following reporting requirement:

32

To demonstrate that the Divide Travel Plan is adequately reducing the potential for and minimizing the effect of any incidental take that may result, the Forest shall complete a report with the information listed below and submit it to [FWS's] Montana Field Office by June 1 of each year for the preceding calendar year.  The report shall include:

     a.  Location and length of routes constructed, restricted, and decommissioned within the action area.

     b. The status of these routes (i.e. open or restricted) and presence of signage, barrier or closure device, if applicable, shall also be described.

     c. Linear open route density by elk herd unit for the area within the Forest boundary.

*Id.*

Plaintiff sought the monitoring reports described in the Divide BiOp via FOIA request to USFS in 2019, but USFS did not produce those reports. D2_1:10537; D2_3:10543–44.  Rather, in response to Plaintiff's ESA 60-day notice, USFS prepared a monitoring report that consolidated all information from 2016 to 2019.  C2:8673; F3:11334–36.  Defendants do not dispute that "there are no individual monitoring reports in the record for the Divide Travel Plan submitted by the June 1, 2017, June 1, 2018, or June 1, 2019 deadlines" subject to the clarification that "[t]he Forest has reported on the monitoring requirements through project level consultations.  *See, e.g.*, C5:9090 (Tenmile Biological Assessment)." (Doc. 31 at 29.)  To the extent Defendants contend that the extraordinarily general statements contained within the project-level example they cite—e.g., "[r]oads that have been closed . . . have been decommissioned" and "[s]everal roads already have gates that restrict access[,]" C5:9090–91—satisfy the BiOp's reporting

requirement, especially when compared to the much more detailed information provided in the consolidated report and the subsequent 2021 report, F3:11334–36; F10:11381–86, the Court rejects their argument. Accordingly, the record demonstrates that for several years, the Forest did not comply with the Divide BiOp's (and Blackfoot Non-Winter Travel Plan BiOp's) reporting requirement. F3:11331 ("With the exception of the continued implementation of the Helena National Forest Plan, no stand alone report has been completed for the reporting requirements in other biological opinions.").

Plaintiff further contends that the existing reports rely on the false assumption that closure devices such as gates and barriers are effective, and they fail to account for the lack of closure devices on 76 miles of closed-on-paper roads, closure effectiveness, or reported violations of road restrictions in calculating open road density in the Divide area. Plaintiff argues that these and the reporting failures require reinitiation of consultation because they constitute new information that impacts grizzly bears in a manner not previously considered in the Divide BiOp and because the record establishes chronic deviations from the Forest's obligation to assure that restricted roads are effectively restricted and that closed routes are gated to the public. (Doc. 27 at 20–21.) Defendants respond that the Travel Plan contemplates implementation of closures through individual projects, which means the Forest has not failed to comply with the Divide BiOp. *See*

34

I1_2:13371 ("Decisions as to closure methods will come as a series of separate decisions in the future as the Travel Plan is implemented[.]").

The Court agrees with Plaintiff that in this case, like in *Probert*, "the record shows chronic deviations from the effective closures envisioned in the Biological Opinion." 416 F. Supp. 3d at 1205. Defendants are correct that the Divide Travel Plan does not require instantaneous installation of gates or physical barriers on all routes identified for restriction or closure. The problem, however, is that the Forest has already identified 76 miles of roads as "restricted" in its transportation database, described such roads as "closed" in monitoring reports, and has excluded them from open linear route density calculations, despite the absence of a closure device. F3:11335–36 ("Closure devices are not reflected in these calculations."); F10:11385–86 (same in 2021 report). The record clearly demonstrates that "closures" through signage or other alternatives to gates and barriers are far less effective than physical closures. G3_11524–28; F1_40:11086–90. And both the Forest Plan and Divide Plan's metrics for determining whether routes should be classified as open for purposes of determining route density require treating routes closed only via signage as open. FWS2949, 2952, 2954; *see also* I1_1:13294–25 (Divide Travel Plan Biological Assessment) (defining closed roads as "[r]oads that are physically closed to public vehicles during seasons when grizzlies are active[,]" including IGBC "restricted roads[,]" which require physical barriers). These facts

demonstrate that the Forest has deviated significantly from its affirmative

obligation in the Divide BiOp to "assure that restricted roads are effectively

restricted and are not being used by wheeled motorized vehicles upon route

closure." I1_2:13409.  To be sure, the Forest cannot be expected to prevent all

unauthorized motor vehicle access in perpetuity, and "infrequent, isolated, or

insignificant deviations from the biological opinion" such as the occasional gate

breach by a third party would not trigger reinitiation of consultation.  *Probert*, 412

F. Supp. 3d at 1205.  But the Forest's decision to assert that 76 miles of roads are

restricted—and thus not factored into open linear route density for purposes of

estimating incidental take of grizzly bears—despite using ineffective closure

methods violates the terms and conditions of the Divide BiOp's incidental take

statement and thus requires reinitiation of ESA consultation pursuant to 50 C.F.R.

§ 402.16(a)(3).  *Ctr. for Biological Diversity*, 698 F.3d at 1115.

Accordingly, the Court will grant Plaintiff's motion for summary judgment

and deny Defendants' cross-motion for summary judgment as it relates to

Plaintiff's claim that Defendants must reinitiate ESA consultation on the Divide

BiOp.

### B.     Blackfoot Non-Winter Travel Plan

As it relates to Plaintiff's claims in this lawsuit, the Blackfoot Non-Winter

Travel Plan BiOp ("Blackfoot BiOp") contains the same key provisions as the

Divide Travel Plan discussed above: use of existing levels of access management and the levels that will result from implementation of the travel plan as surrogate measures of incidental take, H1_2:11683; incidental take statement terms and conditions requiring the Forest to assure that restricted roads are effectively restricted and that closed routes are gated to the public, H1_2:11683–84; and virtually identical reporting requirements (with additional reporting requirements for subunits within the recovery zone), H1_2:11684.  Also as noted above, for several years the Forest failed to comply with the reporting requirements set forth in the Blackfoot BiOp.  F3:11331.  And, as the Forest did for the Divide in its 2020 and 2021 monitoring reports, the Forest has identified 38 miles of roads in the Blackfoot region as "restricted" or "closed" that "are closed via a sign or have no closure device."  F3:11336–37; F5_11350–51.  This classification is contrary to the Forest Plan's metrics for determining open route density areas outside the recovery zone.  FWS2949, 2952, 2954.[3]  In the 2021 monitoring report, the Forest appears to have recognized this issue and added a subsection to the report calculating miles of open routes and linear open route density for the action area outside of the recovery zone that analyzed as "open" the 19 miles of unbarriered routes outside

---

[3] The Court notes, however, that within the recovery zone, the Forest appropriately relied upon IGBC access management guidance "that only roads with a barrier or gate are considered 'restricted'" for purposes of calculating OMRD, TMRD, and core, and thus that aspect does not trigger reinitiation of consultation.  F3:11337–38.

the recovery zone and 34.1 miles of unbarriered routes slated for decommissioning that has not yet been implemented.  F5:11351–52.  However, this same report continues to identify unbarriered routes as "restricted" in other contexts, F5:11350, which violates the Blackfoot BiOp's requirement that the Forest "assure that restricted roads are effectively restricted[,]" H1_2:11684.  Accordingly, for the same reasons discussed above regarding the Divide BiOp, the Court will grant Plaintiff's motion for summary judgment and deny Defendants' cross-motion for summary judgment as it relates to Plaintiff's claim that Defendants must reinitiate ESA consultation on the Blackfoot BiOp pursuant to 50 C.F.R. § 402.16(a)(3).

### C.    Rocky Mountain Ranger District Travel Plans

The Rocky Mountain Ranger District lies entirely within the NCDE recovery zone.  M1_1:17480.  USFS and FWS engaged in informal consultation concerning the Birch Creek and Badger-Two Medicine Travel Plans within the Rocky Mountain Ranger District (collectively, "Rocky Mountain Ranger District Travel Plans") in 2006 and 2008, respectively, concluding in each plan's Biological Assessment ("BA") that each travel plan was "not likely to adversely affect" grizzly bears.  M1_1:17467 (Birch Creek BA); M1_7:17546 (Badger-Two Medicine BA).  Each of these determinations relied in part on an assumption that "[w]idespread public education efforts . . . coupled with enhanced enforcement" of USFS's 2005 off-highway vehicle ("OHV") regulations "would help make the

transition occur more quickly and smoothly" and "[e]ffective signing, patrolling, and enforcement as ongoing activities would help avoid adverse effects." M1_1:17513; M1_7:17575.

Law enforcement data obtained by Plaintiff via FOIA request and acknowledged by USFS indicates 17 recorded instances of illegal vehicle use on closed routes and additional unquantified instances of off-route vehicle use in this area between mid-2014 and 2019.  C2:8668.  Plaintiff contends that these data prove false Defendants' assumption that the 2005 OHV regulation and its enforcement would be effective, which underlies Defendants' "not likely to adversely affect" conclusions.  (Doc. 27 at 28–30.)  Accordingly, Plaintiff argues, Defendants must reinitiate consultation on these Travel Plans pursuant to 50 C.F.R. § 402.16(a)(2)–(3) because documented illegal vehicle use in the area constitutes new information not previously considered and a failed conservation promise. (*Id.*)  Defendants respond that the "not likely to adversely affect" determinations were not based on OHV regulations and their enforcement, but rather the plans' overall reduction in overall road density (including TMRD, which includes closed roads) and secure core.  (Doc. 30 at 35.)

The primary issue presented by Plaintiff's challenges to the Rocky Mountain Ranger District Travel Plans is whether new information has revealed "effects of the action that may affect listed species . . . *in a manner or to an extent not*

*previously considered*" or if the action "is modified in a manner that causes an effect to the listed species . . . *that was not considered*[.]"  50 C.F.R. § 402.16(a)(2)–(3) (emphases added).  Both Rocky Mountain Ranger District Travel Plans emphasized that the area does not have significant road mileage, and thus the issue of motorized access in the area "revolves primarily around motorized trails" and further noted that "[v]ery few physical closure devices are used to implement seasonal or other restrictions on trails."  M1_1:17490; M1_7:17563. The Badger-Two Medicine BA further stated that the proposed travel plan for the area "is straightforward: eliminate all motorized travel except for an extremely limited mileage of access roads at the perimeter of the area."  M1_7:17567. Neither BA discussed potential effects of unauthorized motorized access or potential ineffectiveness of access management efforts, including closures, on grizzly bears.  *See* M1_1:17480–513; M1_7:17556–75.  Rather, they emphasized that the not likely to adversely affect conclusions were based in part on the 2005 OHV regulations that "prohibit off-trail motorized travel" (in tandem with 75% of the Badger-Two Medicine area being in an Inventoried Roadless Area), which would be expected to "greatly reduce motorized travel on the RMRD" according to the Birch Creek BA and "eliminate motorized travel from BTM except for a few key access roads near the perimeter."  M1_1:17512; M1_7:17575.  They also emphasized enforcement and education regarding the 2005 OHV regulations as

recommendations for avoiding adverse effects.  *Id.*  Law enforcement records

demonstrate that unauthorized motorized access subsequently has occurred in the

area, and, accordingly, new information indicates that the effects of the action may

affect the grizzly bear in a manner not previously considered in the Rocky

Mountain Ranger District Travel Plans' BAs—which focused heavily on the OHV

regulations because of the general lack of roads in the area—and with which FWS

concurred.  Accordingly, reinitiation of consultation on those travel plans is

required under 50 C.F.R. § 402.16(a)(2).

CONCLUSION

IT IS ORDERED that Plaintiff's motion for summary judgment (Doc. 26) is

GRANTED.

IT IS FURTHER ORDERED that Defendants' cross-motion for summary

judgment (Doc. 29) is DENIED.

IT IS FURTHER ORDERED that this matter is remanded to the agencies for

further proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment and close this case.

DATED this 3rd day of August, 2023.

Dana L. Christensen, District Judge
United States District Court